J-S14031-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.D.S. A/K/A S.S., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: V.H., MOTHER | : : : : : : : : | |
| | : | No. 3716 EDA 2017 |

Appeal from the Decree Entered October 25, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0000981-2017,
CP-51-DP-0002024-2015, FID: 51-FN-001680-2015

| | | |
|---|---|---|
| IN THE INTEREST OF: T.R.G. A/K/A T.G., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: V.H., MOTHER | : : : : : : : : | |
| | : | No. 3717 EDA 2017 |

Appeal from the Decree Entered October 25, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0000982-2017,
CP-51-DP-0002025-2015, FID: 51-FN-001680-2015

BEFORE:  OTT, J., McLAUGHLIN, J., and RANSOM*, J.

MEMORANDUM BY RANSOM, J.:                    **FILED APRIL 03, 2018**

Appellant, V.H. ("Mother"), appeals from the decrees of the Family Court Division of the Court of Common Pleas of Philadelphia County, entered October 25, 2017, that terminated her parental rights to and changed the permanency goal from reunification to adoption for her sons, T.R.G., born

---

\*   Retired Senior Judge assigned to the Superior Court.

2006, and S.D.S., born 2010 ("the Children"). We affirm the decrees on the basis of the trial court opinion.

In its opinion, entered December 7, 2017, the trial court fully and correctly sets forth the relevant facts and procedural history of this case. *See* Trial Court Opinion (TCO), 12/7/17, at 2-15. Thus, we have no reason to restate them at length here.

For the convenience of the reader, we briefly note that, in May 2015, then-five-year-old S.D.S. was evaluated at St. Christopher's Hospital for Children; in July 2015, the Philadelphia Department of Human Services ("DHS") received a general protective services ("GPS") report alleging that S.D.S. was nonverbal and unable to walk. The day after receiving the GPS report, DHS visited Mother's home, which had a strong odor of urine, was infested with flies, and had a kitchen floor with structural deficiencies and the possibility of collapse. DHS returned four days later and observed S.D.S. eating food from his lap and off a soiled couch. A social worker returned three days later, but Mother refused to allow the social worker to enter. The social worker tried again three days later and a day after that but still could not gain access. The social worker returned with police and removed the Children, and DHS obtained orders of protective custody for the Children that same day. S.D.S., who has DiGeorge Syndrome,[1] was placed with Woods Services

_____

[1] A birth defect that caused the poor development of several of S.D.S.'s bodily systems, including his immune system.

- 2 -

("Woods"), an educational and residential center for children with special needs.

In October 2017, DHS filed petitions to terminate Mother's parental rights to the Children. The trial court held a hearing on these petitions later that month.

Kwaima Sanders, a case manager with the community umbrella agency NorthEast Treatment Center ("NET") testified that DHS removed the Children from Mother's home, due to the home's deplorable condition and the Children's inadequate healthcare. Notes of Testimony (N. T.), 10/25/17, at 6-22, 29-32, 36-38, 49. She continued that NET had developed a single case plan ("SCP") for Mother, with the following aims: to attend parenting classes for children with special needs, to make home repairs identified as safety threats in order to ensure that the home is suitable for the Children, to attend visitation, to collaborate with professionals regarding planning and goals for the Children, and to comply with mental health treatment. She added that, at the time of the termination hearing, Mother continued to reside in the same home from which the Children had been removed, as she was unable to obtain housing from either the Philadelphia Housing Authority ("PHA") or Section 8 through the U.S. Department of Housing and Urban Development ("HUD"), and the house continued to be in poor condition, including having lead in the home, which Mother had failed to have removed, as she could not obtain funding for the repairs from a nonprofit. Sanders also testified that Mother had only attended visitation with S.D.S. twice in 2017, even though visitation

was supposed to be weekly, and had missed more than half of her visitations with T.R.G. She further testified that the Children would not suffer irreparable harm if Mother's parental rights were terminated and that it would be in their best interests to do so. She acknowledged that T.R.G., who was then ten-years-old, had lived with his paternal grandmother, M.G. ("Grandmother"), for almost two years at the time of the hearing.

Grandmother confirmed that T.R.G. had lived with her since December 2015 and that she has been his primary caregiver and seeks to adopt him. N.T. at 52, 58.

Casey Chavinka, a program specialist at Woods and S.D.S.'s special services manager, also testified. N. T. at 66-72. According to Chavinka, since being removed from Mother's custody and arriving at Woods in 2015, S.D.S. has learned to walk and to eat with utensils.

At the conclusion of the hearing, the trial court entered decrees changing the permanency goal for the Children from reunification with Mother to adoption and terminating Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b). Mother's timely appeals followed in November 2017.[2]

Mother raises the following questions on appeal:

1. Did the [t]rial [c]ourt commit reversible error, when it involuntarily terminated Mother's parental rights where such

---

[2] Mother timely filed her notices of appeal and statements of errors complained of on appeal in November 2017. *See* Pa.R.A.P. 1925(a)(2)(i). The trial court entered its opinion in December 2017. *See* Pa.R.A.P. 1925(a)(2)(ii).

determination was not supported by clear and convincing evidence under the adoption act, 23 P[a].C.S.[] §2511(a)(1), (2), (5) and (8)?

2. Did the [t]rial [c]ourt commit reversible error, when it involuntarily terminated Mother's parental rights without giving primary consideration to the effect that the termination would have on . . . the developmental, physical and emotional needs of the children as required by the adoption act, 23 P[a].C.S.[] §2511(b)?

3. Did the [t]rial [c]ourt commit reversible error, when it terminated Mother's parental rights and changed the children's goals to adoption as substantial, sufficient, and credible evidence was presented at the time of trial which would have substantiated denying the Petition for Goal Change?

Mother's Brief at 4.

We consider Mother's arguments about the termination of her parental rights in light of our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations, brackets, and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101–2938, which requires a bifurcated analysis.

- 5 -

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We will affirm if we agree with the trial court's decision as to any one subsection of 23 Pa.C.S. § 2511(a) and its decision as to § 2511(b). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Here, we affirm the trial court's decision to terminate Mother's parental rights under subsections 2511(a)(1) and (b), which provide:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\* \* \*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any

efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

Further,

A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008) (citation omitted).

As for Mother's challenge to the change of the Children's permanency goals to adoption, the Supreme Court of Pennsylvania set forth our standard of review in a dependency case, including a goal change, as follows:

The standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. We review for abuse of discretion.

*In re J.M.*, 166 A.3d 408, 416 (Pa. Super. 2017) (citations and internal quotation marks omitted).

In *In re A.K.*, 936 A.2d 528, 534 (Pa.Super. 2007), this Court stressed that the focus of dependency proceedings is upon the best interest of the children and that those considerations supersede all other concerns, "including the conduct and the rights of the parent." Again, in *In the Interest of D.P.*, 972 A.2d 1221, 1227 (Pa.Super. 2009), we explained, "In a change of goal proceeding, the best interests of the child, and not the interests of the parent, must guide the trial court, and the parent's rights are secondary." *Id.* Likewise, this Court has held, "a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting."

- 7 -

> *In re N.C.*, 909 A.2d 818, 824 (Pa.Super. 2006) (quoting *In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa.Super. 2003)).

*In re L.T.*, 158 A.3d 1266, 1276 (Pa. Super. 2017).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the trial court, we conclude that there is no merit to the issues that Mother has raised on appeal. The trial court opinion properly disposes of the questions presented. *See* Trial Court Opinion (TCO), 12/7/17, at 18-24 (finding that: (I) DHS had met its burden by clear and convincing evidence to terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1) -- in the form of Chavinka's testimony about S.D.S.'s improvement since his removal from Mother's custody and Sanders's testimony about the reasons for the Children's removal by DHS, Mother's SCP objectives, including safe housing and visitation, and Mother's failure to comply with her SCP aims -- thereby establishing that Mother failed and refused to perform parental duties, failed to address the conditions which brought the Children into placement, and lacks the capacity to provide care and control and a healthy, safe, and stable environment for the Children; (II) termination of Mother's parental rights was in the Children's best interests and that DHS met its burden pursuant to 23 Pa.C.S. § 2511(b) by relying on the credible testimony of Grandmother and of Sanders that the Children would not suffer irreparable harm if Mother's parental rights were terminated, that it would be in the Children's best interests to do so, and that T.R.G. had already lived with Grandmother since 2015; and (III) the change of the Children's permanency goal to adoption was proper, because Grandmother's

and Sanders's testimony established that the Children have thrived and shown substantial improvement in their conditions by living in foster care, making the goal change in the best interests of the Children).[3]  Accordingly, we affirm the termination of Mother's parental rights to the Children and the change of the permanency goal for the Children from reunification to adoption on the basis of the trial court's opinion.

Decrees affirmed.  Jurisdiction relinquished.

Judgment Entered.

_Joseph D. Seletyn, Esq._
Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/3/18

---

[3] Mother's challenge to the change of the Children's permanency goal to adoption is controlled by the Juvenile Act, 42 Pa.C.S. §§ 6301-6375.  In challenging the goal change to adoption, Mother does not contend that the trial court failed to consider any of the factors enumerated in § 6351(f) of the Juvenile Act regarding permanency planning, with the arguable exception of § 6351(f)(3), "The extent of progress made toward alleviating the circumstances which necessitated the original placement."  Mother's Brief at 18-19.  In her argument about the goal change, Mother maintains that she has "worked to repair her home or alternatively secure other housing, in an attempt to remedy the situations that might have previously created a safety issue for the [C]hildren."  _Id._ at 19.  However, this claim is belied elsewhere in her brief, where she admits that she has not had the lead cleaned out of her home, is unable to obtain assistance from a nonprofit to fix the home, and was on waiting lists for housing from both PHA and HUD.  _Id._ at 11 (citing N. T. at 15-16, 38).

THE FIRST JUDICIAL DISTRICT OF PENNSYLVANIA, PHILADELPHIA COUNTY
IN THE COURT OF COMMON PLEAS

| | |
|---|---|
| IN THE INTEREST OF: | : FAMILY COURT DIVISION |
| | : JUVENILE BRANCH-DEPENDENCY |
| | : |
| S.D.S., a Minor | : CP-51-AP-0000981-2017/CP-51-DP-0002024-2015 |
| d/o/b: 06/██/2010 | : |
| | : |
| T.R.G., a Minor | : CP-51-AP-0000982-2017/CP-51-DP-0002025-2015 |
| d/o/b: 12/██/2006 | : |
| | : |
| | : Superior Court Nos. |
| | : 3716 EDA 2017 and 3717 EDA 2017 |
| Appeal of: | : CONSOLIDATED |
| V.H., Mother | : |

2017 DEC 11 AM 8:11
PROPROTHY
RECEIVED

## OPINION

V.H. ("Mother"), Appeals from the Decrees and Orders entered by this Court on

October 25, 2017, granting the Petitions to Involuntarily Terminate Mother's Parental

Rights to her two minor Children: a male, S.D.S., (d/o/b March ██, 2010), and a male,

T.R.G., (d/o/b December ██, 2006), and changing the Children's Permanency Goals to

Adoption, filed by the Department of Human Services ("DHS") on October 5, 2017, and

served on all parties.

After the Termination/Goal Change Hearing on October 25, 2017, this Court

found that clear and convincing evidence was presented to terminate the parental rights of

Mother as to her two minor Children. In response to the Orders of October 25, 2017,

terminating her parental rights, Mother, filed Appeals on November 15, 2017. These

Appeals were Consolidated by Order of Appellate Court on December 4, 2017.

1

T.R.G.'s Father, M.T.G's Parental Rights were also terminated, however, Father did not file an Appeal.

S.D.S.'s, Father, D.C.S., is incarcerated, and the Goal Change and Termination hearing regarding his parental rights is listed before this Court on January 10, 2018.

## STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

In her Statement of Matters Complained of on Appeal, Mother raises the following issues:

1. The Trial Court committed reversible error, when it involuntarily terminated Mother's parent rights where such determination was not supported by clear and convincing evidence under the Adoption Act, 23 Pa.C.S.A. §2511(a) (1), (2), (5), and (8).

2. The Trial Court committed reversible error, when it involuntarily terminated Mother's parental rights without giving primary consideration to the effect that the termination would have on the developmental, physical and emotional needs of the Children as required by the Adoption Act, 23 Pa.C.S.A. §2511(b).

3. The Trial Court committed reversible error, when it terminated Mother's parental rights and changed the Children's goal to adoption as substantial, sufficient, and credible evidence was presented at the time of the trial which would have substantiated denying the Petition for Goal Change.

## PROCEDURAL HISTORY

V.H., is the Mother of S.D.S., and T.R.G. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 10/05/2017, ¶"a").

2

M.T.G., is the Father of T.R.G., and is listed as the Father on the Child's birth certificate. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 10/05/2017, ¶"b").

D.C.S., is the Father of S.D.S., and is listed as the Father on the Child's birth certificate. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 10/05/2017, ¶"c").

On July 9, 2015, the Department of Human Services (DHS) received a General Protective Services (GPS) Report alleging that five year old S.D.S., was nonverbal and unable to walk; that the Child was evaluated at St. Christopher's Hospital for Children on May 28, 2015; that the Children's Mother, V.H., stated that the Child, S.D.S., was previously treated by pediatricians at Strawberry Mansion and Temple University Hospital; that Mother stated that she had not had the Child medically evaluated in over two years because he had not been ill; that the Child has never been evaluated or treated by a specialist; that Mother and the Child attended an appointment in the Orthopedics Department on 5/28/2015, and that blood tests were performed; that the hospital received the results of the blood tests on 6/18/2015, which indicated that he had a slightly elevated lead level and that he had DiGeorge Syndrome, which could explain why he was delayed. The Report alleged that S.D.S., would need to be evaluated by numerous specialists; that a neurology appointment was scheduled for 6/01/2015; that Mother cancelled that appointment and rescheduled it for 6/19/2015; that Mother and the Child failed to attend the 6/19/2015 appointment; that Mother and the Child attended a cardiology appointment on 6/30/2015; that it was determined that the Child did not suffer from any heart-related issues; that Mother and Child failed to attend a doctor's appointment at St. Christopher's

3

Hospital for Children on 7/09/2015; that the Child had an appointment scheduled in the neurology department on 7/27/2015 and the hospital staff was concerned that Mother was unable to care for the Child and appeared overwhelmed. The Report further alleged that the Child's diagnosis of DiGeorge Syndrome was not a result of not attending routine doctor's appointments; that the Child had never been enrolled in school; that the Child exhibited self-injurious behavior; that the Children's Maternal Grandparents, W.M., and A.H., reside in the home; that they both may have cognitive delays; that Mother stated that she suffers from social anxiety and depression; that V.H., was not engaged in mental health treatment; that Mother did not appear to comprehend the severity of S.D.S.'s condition; and that Mother failed to ensure that the Child received adequate medical care. This Report was determined as valid. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 10/05/2017, ¶"d").

On July 10, 2015, DHS visited the home to investigate the allegations of the GPS Report. The home had a strong odor of urine and was infested with flies, and DHS observed that the kitchen floor seemed to have structural deficiencies and felt weak with the possibility of collapse. Mother stated that S.D.S., often removes his diaper and urinates throughout the home. Mother stated that she had missed some appointments for the Child, but intended to attend his neurology appointment on 7/27/2015. DHS observed that Mother appeared overwhelmed with the Child's care, and inquired if the Child received any services such as Ken Crest, Elwyn, or Early Intervention. Mother stated she was not aware of the programs and that she did not trust strangers to care for the Child because he is nonverbal. DHS advised Mother that the Children could not remain in the home unless in-home services were implemented, and Mother agreed to

4

accept Rapid Service Response Initiative (RSRI) services. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 10/05/2017, ¶"e").

On July 14, 2015, DHS and two DHS visiting nurses went to the family home. S.D.S., was observed eating food from his lap and off the soiled couch. DHS nurses spoke with Mother about obtaining a medical high chair, which would help keep the home clean and sanitary. DHS contacted the Philadelphia Child Guidance Resource Center and scheduled an appointment for S.D.S., on 7/23/2015. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 10/05/2017, ¶"f").

On July 17, 2015, the RSRI social worker went to the family's home; however, Mother refused the RSRI services and refused to allow the RSRI social worker inside the home. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 10/05/2017, ¶"g").

On July 20, 2015, the RSRI social worker went to the family's home; however, no one answered the door. RSRI contacted Mother by telephone and she stated she had been called away for an emergency appointment. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 10/05/2017, ¶"h").

On July 21, 2015, the RSRI social worker went to the family's home and observed the Maternal Grandparent, A.H., outside the home on the porch and she appeared to be under the influence of drugs or alcohol. A.H. stated that Mother was not home and that the Children were inside the home. A.H., blocked access to the home and refused to permit the RSRI social worker inside the home to assess the Children's safety.

5

(Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 10/05/2017, ¶"i").

On July 21, 2015, DHS went to the family's home with police assistance. T.R.G., was only wearing underpants, and was instructed to get dressed. He returned wearing soiled clothing that smelled of urine and S.D.S., was wearing soiled pajamas that also had a strong odor of urine. Maternal Grandparent, W.M., became aggressive and threatened DHS, as DHS explained that the Children could not remain in the home. DHS requested T.R.G.'s asthma inhaler; however, Mother was unable to produce it. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 10/05/2017, ¶"j").

On July 21, 2015, DHS obtained an Order of Protective Custody (OPC) for the Children, and placed them in foster care through NorthEast Treatment Center (NET). (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 10/05/2017, ¶"k").

Shelter Care Hearings were held on July 23, 2015, before the Juvenile Court Hearing Officer, William T. Rice. The Court ordered the OPC's lifted. Temporary legal custody of both Children transferred to DHS, and placement of the Children in Foster Care through NET. S.D.S., is unable to walk and talk due to Syndrome, and will need lifelong care. The Child has a high lead level in his system, and the house has a high lead level of 7. Kitchen floor is unstable. Mother was offered services, but she refused them. Child has several medical appointments coming up. Father is D.C.S. The Child, T.R.G., has asthma. Father is M.T.G. DHS to explore Aunt as possible placement. Mother to

have supervised weekly visits at the Agency. Children may be moved prior to next court date by agreement of the parties. (Shelter Care Orders, 7/23/2015).

Continuances for both cases were granted on July 31, 2015. Temporary Commitment to stand. Mother to have supervised visits with the Children at the Agency. (Continuance Orders, 7/31/2015)

On September 2, 2015, Community Umbrella Agency (CUA) held an Initial Single Case Plan (SCP) Meeting. The parental objectives for Mother were: 1) comply with NET/CUA referrals made by the Agency for parenting classes of Children with special needs; 2) continue to make home repairs identified as safety threats to ensure home is suitable for the Children; 3) continue to participate in court ordered supervised visits scheduled for the Children; and 4) collaborate with the professionals regarding planning and goals for the Children. There were no parental objectives established for the Fathers of the Children. Mother participated in the Meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 10/05/2017, ¶"n").

Adjudicatory Hearings for both Children were held on September 17, 2015, before the Honorable Allan L. Tereshko. Children Adjudicated Dependent. Legal custody of the Children to remain with DHS, and placement of S.D.S., will be by Woods Services. Placement of T.R.G., is in Kinship Care with Paternal Grandmother, and can be moved to home of Paternal Grandmother today. Mother to continue with weekly supervised visits at the Agency. Mother was present at the hearing. (Orders of Adjudication and Disposition—Child Dependent, 9/17/2015).

7

On December 2, 2015, CUA held a revised Single Case Plan (SCP) Meeting. The parental objectives for Mother remained the same. Parental objectives were established for both Fathers. Mother participated in the meeting by telephone. Fathers did not participate in the meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 10/05/2017, ¶"p").

Permanency Review Hearings for both Children were held on December 11, 2015, before the Juvenile Court Hearing Officer, Carol A. Carson. Continuances were granted by the Court, and the Status Quo remains. (Continuance Orders, 12/11/2015).

Continuances for both cases were granted on February 12, 2016, by the Honorable Margaret T. Murphy. Mother's counsel, Janice Sulman was not available. (Continuance Orders, 2/12/2016).

Continuances for both cases were granted on April 29, 2016, by the Honorable Margaret T. Murphy. The Child Advocate failed to appear for the hearing. (Continuance Orders, 4/29/2016).

Permanency Review Hearings were held on May 6, 2016, for both Children before the Honorable Allan L. Tereshko. The Court ordered legal custody of the Children to remain with DHS, and placement continues in a residential treatment facility through Woods Services for S.D.S., and Foster Care Kinship for T.R.G. Mother to have unsupervised visits with the Children on campus and in the community. Mother referred to BHS for consultations and/or evaluations. CUA to explore appropriate goals for Children, and family members as resources. CUA to do evaluation on T.R.G.'s Father's home. (Permanency Review Orders, 5/06/2016).

Continuances for both cases were granted on November 2, 2016, by the Honorable Richard J. Gordon. The Child Advocate was unavailable. Remain as committed. (Continuance Orders, 11/02/2016).

Permanency Review Hearings were held on January 18, 2017, for both Children before the Honorable Allan L. Tereshko. The Court ordered legal custody of the Children to remain with DHS, and placement continues in a residential treatment facility through Woods Services for S.D.S., and Foster Care Kinship for T.R.G. Mother referred to BHS for monitoring and to comply with mental health treatment. Mother's visitation is adequate with both Children. A Parent Locator Search must be conducted on T.R.G.'s Father, M.T.G. Father's visits are suspended until he appears in Court. Siblings to visit at least twice per month. (Permanency Review Orders, 01/18/2017).

On April 18, 2017, a JFK Behavior Health Center Report was received for Mother. She currently resides with her parents and receives SSI benefits. Mother reported a long history of depressive symptoms and a history of opiate abuse. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 10/05/2017, ¶"t").

Permanency Review Hearings were held on April 20, 2017, for both Children before the Juvenile Court Hearing Officer, Carol A. Carson. The Court ordered legal custody of the Children to remain with DHS, and placement continues in a residential treatment facility through Woods Services for S.D.S., and Foster Care Kinship for T.R.G. Mother's visitation is adequate with both Children. Sibling visits are to occur with Grandmother once a month on Saturday. S.D.S., attends school in a day care program and receives occupational and speech therapy. T.R.G., attends the 4th grade at Spruance

9

School, and has a current IEP. He attends life skills class and has ADHD, but is no longer on medication. Both Children are up-to-date medically. Mother referred to BHS for monitoring, and CUA to assist Mother with alternative housing. (Permanency Review Orders, 4/20/2017).

On July 11, 2017, S.D.S.'s Father, D.C.S., was arrested and charged with aggravated assault, simple assault, reckless endangerment of another person, and resisting arrest. He is incarcerated at CFCF. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 10/05/2017, ¶"w").

Permanency Review Hearings were held on July 19, 2017, for both Children before the Honorable Allan L. Tereshko. The Court ordered legal custody of the Children to remain with DHS, and placement continues in a residential treatment facility through Woods Services for S.D.S., and Foster Care Kinship for T.R.G. Mother's visitation is adequate with T.R.G. Mother's visits with S.D.S., is not adequate, as Mother has not visited with the Child this year, 2017. Visitation is now supervised. Sibling visits are to continue as arranged. Mother re-referred to BHS for monitoring and/or evaluation. CUA to re-refer Mother to ARC program for appropriate services. CUA to evaluate Mother's home and to assist Mother with housing programs and PHMC grants and to provide Mother with tokens for visits, and Mother's visits may be modified by agreement before the next court date. (Permanency Review Orders, 7/19/2017).

On August 23, 2017, a JFK Behavioral Health Center Attendance Letter and Report was received for Mother. She attended an intake assessment for treatment on 1/09/2017, but had not attended any sessions thereafter. Mother attended a psychiatric evaluation on 5/24/2017, but has failed to participate in mental health treatment since that

10

time. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 10/05/2017, ¶"x").

## TERMINATION HEARING

This Court held Contested Termination and Goal Change Hearings for both Children regarding the termination of both Mother and T.R.G.'s Father, M.T.G.'s parental rights on October 25, 2017. Mother was present at the hearing and represented by counsel. Father, M.T.G. was present and represented by counsel. S.D.S.'s Father, D.C.S., is incarcerated and his Contested Termination and Goal Change Hearing is scheduled for 1/10/18. (N.T., 10/25/2017, p.3 at 13; p.4 at 12-23).

Bridget Warner, Counsel for DHS, called her first witness, Kwaima Sanders, Case Manager at NET CUA. She testified that she received the case in June 2017 and reviewed the entire file at that time because the prior Case Manager is not with the Agency anymore. She noted the Children came into DHS care in June 2015, because of inadequate healthcare. St. Christopher's Hospital for Children called in a Report. DHS removed the Children from the home because of inadequate healthcare and the home they were living in was in deplorable condition. There were four cats in the home along with the Children, and the entire home smelled of urine. The floors were unsafe and needed repairs. The appliances did not work, and the Children were found in dirty and soiled clothing. At the time the five year old, S.D.S., was not walking, not talking and not doing much of anything. He was diagnosed with DiGeorge Syndrome and was placed at a Woods facility. She testified the other Child, T.R.G., was placed with his Paternal

11

Grandmother, M.G., since approximately December 2015. (N.T., 10/25/2017, p.6 at 1-25; p.7 at 1-25; p.8 at 1-25; p.9 at 1-12).

Ms. Sanders testified that Mother's objectives were to comply with NET, make necessary repairs to the house, comply with visitation, and to collaborate with medical professionals regarding S.D.S.'s healthcare. A later component was added requiring Mother to comply with mental health treatment at JFK. As of August 23, 2017, JFK's last Report regarding Mother noted that she had been to their facility once in January 2017, and attended an evaluation on 5/24/2017. Mother was diagnosed with severe depression disorder. Mother told her she was attending other sessions at JFK, however, she never provided documentation. (N.T., 10/25/2017, p.10 at 2-25; p.11 at 1-25; p.12 at 1-25).

Ms. Sanders also testified that Mother was Court ordered in 2016, to complete a Parental Capacity Evaluation (PCE), however, that was never completed and the mental health issues were never addressed. Mother continues to reside with her mother at 2242 N. Sydenham Street, which is the original home where the Children were removed. She conducted a home visit and the home was in poor condition. They continue to have 5 cats as pets and the house reeks of urine odor. There was no stove and the family uses hot plates for cooking. The refrigerator was inoperative. There were issues with the stairs and floors, which were broken and unstable. Mother noted the City of Philadelphia asked her to move out so that the lead paint could be removed, however, she could not afford to move elsewhere and the walls were painted over with non-lead paint. Mother refuses to live in a homeless shelter because she feels unsafe. She reported she was on a waiting list for Section 8 and PHS housing waiting lists. Mother admitted she does not

12

want to leave the property because it belonged to her family and she does not have to pay rent. The Title of the house is not in her name, therefore, CUA has encountered problems approving assistance. She opined it would be inappropriate for the Children to return to that home, considering the conditions. (N.T., 10/25/2017, p.13 at 1-25; p.14 at 1-25; p.14 at 1-25; p.15 at 1-25; p.16 at 1-25; p.17 at 1-16).

Ms. Sanders also stated that Mother was referred to ARC for parenting and housing, however, Mother did not comply. She receives SSI income, and is not employed. (N.T., 10/25/2017, p.18 at 1-25; p.19 at 1-25; p.20 at 1-6).

Regarding visitation, Ms. Sanders stated Mother has visited with S.D.S., at Woods twice in 2017, April and 10/23/2017. Mother visits with T.R.G., are every Tuesday, supervised at the Agency. She attended 6 out of 14 scheduled visits. Mother is inconsistent with visitation. Ms. Sanders noted she visits with T.R.G., at his Paternal Grandmother's house. She has observed a positive environment for the Child with his Paternal Grandmother. She testified the Child does not ask about his Mother at any time. Mother does not communicate with her and is inconsistent returning telephone or text messages. (N.T., 10/25/2017, p.20 at 7-25; p.21 at 1-25; p.22 at 1-25).

Ms. Sanders opined that the Children would not suffer irreparable harm and it would be in their best interest if their parent's rights were terminated. Regarding T.R.G., the Child tells Ms. Sanders that he likes to visit with Mother, however, he feels safe with his Paternal Grandmother. He never asks for his parents and seems happy in his home. He does receive special services because he was having issues last year in school. Paternal Grandmother is the one who attends all the school meetings and counseling sessions.

13

Regarding S.D.S., Ms. Sanders testified the Child has seen his Mother twice in 2017. Mother is always provided with tickets for transportation by CUA, however, Mother does not use the tickets. The Child now receives physical and occupational therapy twice per week. The Child is now walking on his own, and is eating with utensils. He continues to be nonverbal, but is making various noises, and she has seen the Child progressing while at Woods. (N.T., 10/25/2017, p.29 at 3-25; p 30 at 1-25; p.31 at 1-25; p.32 at 1-16).

Ms. Sanders noted that S.D.S., is 7 years old and has been at Woods for approximately two years. She opined there is no parental bond between Mother and the Child. He has occasional visits with his Paternal Grandmother and Paternal Aunt, and continues to have Court ordered visits with his sibling, T.R.G. T.R.G., is 10 years old and has been with Paternal Grandmother for approximately two years. She opined she believes there is a bond between T.R.G., and Mother, however the Child seeks Paternal Grandmother for care and safety. (N.T., 10/25/2017, p.36 at 2-25; p.37 at 1-25; p.38 at 1-12; p.49 at 2-22).

M.G., Paternal Grandmother of T.R.G., also testified. She stated her grandson has been with her since December of 2015. She seeks to adopt her grandson and has been his primary caretaker and has seen a marked improvement in the Child since he has been with her. (N.T., 10/25/2017, p.52 at 2-8; p.58 at 3-19).

Casey Chavinka, Program Specialist at Woods, was the next witness to testify. She has been S.D.S.'s special services manager since June of 2016. However, the Child has been residing at Woods since 7/30/2015. She stated she is in charge of the Individual Service Plan (ISP) to develop goals for the Child and to share information between the

14

staff members for the Child's care. The Child currently receives 24-hour supervision and intermittent visual supervision overnight, with face-to-face bed checks every 10 minutes. He attends school at Davis Elementary, off campus and receives PT, OT, and Speech Therapy. The Child has improved in walking and is now eating with utensils. (N.T., 10/25/2017, p.66 at 22-25; p.67 at 1-25; p. 68 at 1-25).

Regarding Mother's visitation, Ms. Chavinka testified she contacts her once per month, then if that is not successful, she contacts her a second time. Mother responds about 50% of the time. Mother has never attended the ISP Meetings at the facility, although she is invited. Mother's only level of participation in S.D.S.'s life is giving verbal consents to nursing calls she receives. She noted her records show Mother has visited the Child three times since she took over. Her most recent visit was 10/23/2017, and she saw him on 4/19/2017, three times total in 2017. (N.T., 10/25/2017, p.69 at 1-25 p.70 at 1-25; p.71 at 1-25; p.72 at 1-19).

Mother was the next witness to testify. She stated she does not visit S.D.S., frequently because of transportation issues. She does visit T.R.G., on Tuesdays at 4 p.m. and they talk and play games. She also speaks to him on the telephone. She misses some visits because she is ill or the bus was often late. (N.T., 10/25/2017, p.74 at 1-25; p 75 at 1-19).

## STANDARD OF REVIEW AND LEGAL ANALYSIS

When reviewing an appeal from a decree terminating parental rights, an appellate Court is limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient

15

evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, an appellate court must accord the hearing judge's decision the same deference that it would give to a jury verdict. The Pennsylvania Superior Court need only agree with a trial court's decision as to any one subsection under 23 P.C.S.A. §2511 (a) in order to affirm a termination of parental rights. *In re D.A.T. 91 A.3d 197 Pa.Super.2014).*

The standard of review in termination of parental rights cases requires appellate Courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. In re T.S.M., 620 Pa. 602, 71 A.3d 251, 267 (2013) (citations and quotation marks omitted) In re Adoption of C.D.R., 2015 PA Super 54, 111 A.3d 1212, 1215 (2015).

Termination of parental rights is governed by Section 2511 of the Adoption Act 23 Pa.C.S.A. §§ 2101–2938, which requires a bifurcated analysis. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and

16

welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond. *In re L.M.*, 923 A.2d 505, 511 (Pa.Super.2007) (citations omitted). In re Adoption of C.J.J.P., 2015 PA Super 80, 114 A.3d 1046, 1049-50 (2015). The Court need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. In re Adoption of C.J.J.P., 2015 PA Super 80, 114 A.3d 1046, 1050 (2015).

These Children became known to DHS on July 9, 2015, when the Department of Human Services (DHS) received a General Protective Services (GPS) Report alleging that five year old S.D.S., was nonverbal and unable to walk; that the Child was evaluated at St. Christopher's Hospital for Children on May 28, 2015; that the Children's Mother, V.H., stated that the Child, S.D.S., was previously treated by pediatricians at Strawberry Mansion and Temple University Hospital; that Mother stated that she had not had the Child medically evaluated in over two years because he had not been ill; that the Child has never been evaluated or treated by a specialist; that blood tests were performed and the results of the blood tests on 6/18/2015, which indicated that he had a slightly elevated lead level and that he had DiGeorge Syndrome, which could explain why he was delayed. Mother cancelled and failed to attend medical appointments. The Report further alleged that the Child had never been enrolled in school; that the Child exhibited self-injurious behavior; that Mother stated that she suffers from social anxiety, depression, and was not engaged in mental health treatment.

17

DHS advised Mother that the Children could not remain in the home unless in-home services were implemented, and Mother agreed to accept Rapid Service Response Initiative (RSRI) services. On July 14, 2015, DHS and two DHS visiting nurses went to the family home. S.D.S., was observed eating food from his lap and off the soiled couch. On July 17, 2015, the RSRI social worker went to the family's home; however, Mother refused the RSRI services and refused to allow the RSRI social worker inside the home. On July 21, 2015, DHS obtained an Order of Protective Custody (OPC) for the Children, and placed them in foster care through NorthEast Treatment Center (NET). S.D.S., required 24-hour medical care and was placed at a facility through Woods. T.R.G., was placed in Kinship foster care with his Paternal Grandmother.

### A. The Trial Court Properly Found the Department of Human Services Met Its Burden by Clear and Convincing Evidence to Terminate Mother's Parental Rights Pursuant to 23 Pa.C.S.A. §2511(a)(1), and (2), (5), and (8)[1]

---

[2] (a) General Rule.—the rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parenting claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

(5) The child has been removed from the care of the parents by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

(8) The child has been removed from the care of the parent by the court or under voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or

Mother alleges the Court erred when it involuntarily terminated Mother's parental rights because the decision was not supported by clear and convincing evidence. This Court disagrees.

This Court found clear and convincing evidence that Mother failed and refused to perform parental duties, failed to address the conditions which brought the Children into placement, and lacks the capacity to adequately provide care and control and a stable environment necessary for the seven year old special needs Child, and the other Child who will be eleven years old this year.

This Court relied on the credible testimony of Kawaima Sanders, the CUA NET Case Manager, who testified that DHS removed the Children from the home because of inadequate healthcare and the home they were living in was in deplorable condition. There were four cats in the home along with the Children, and the entire home smelled of urine. The floors were unsafe and needed repairs. The appliances did not work, and the Children were found in dirty and soiled clothing. At the time the five year old, S.D.S. was not walking, not talking and not doing much of anything. He was diagnosed with DiGeorge Syndrome and was placed at a Woods facility. She noted the other Child, T.R.G., was placed with his Paternal Grandmother, M.G., in December 2015.

She further testified that the SCP objectives for Mother were to: 1) comply with NET/CUA referrals made by the Agency for parenting classes of Children with special needs; 2) continue to make home repairs identified as safety threats to ensure home is suitable for the Children; 3) continue to participate in Court ordered supervised visits

---

placement, the conditions which led to the removal or placement of the child continue to exist and termination of the parental rights would best serve the needs and welfare of the child.

scheduled for the Children; and 4) collaborate with the professionals regarding planning and goals for the Children.

A later component was added requiring Mother to comply with mental health treatment at JFK. Ms. Sanders testified that as of August 23, 2017, JFK's last Report regarding Mother noted that she had been to their facility once in January 2017, and attended an evaluation on 5/24/2017. Mother was diagnosed with severe depression disorder. Mother told her she was attending other sessions at JFK, however, she never provided documentation. She further testified that Mother was Court ordered in 2016, to complete a Parental Capacity Evaluation, however, that was never completed and the mental health issues were never addressed.

Regarding housing, Ms. Sanders testified that Mother continues to reside with her mother at 2242 N. Sydenham Street, which is the original home where the Children were removed. She conducted a home visit and the home was in poor condition. They continue to have 5 cats as pets and the house reeks of urine odor. There was no stove and the family uses hot plates for cooking. The refrigerator was inoperative. There were issues with the stairs and floors, which were broken and unstable. Mother reported to her that she was on a waiting list for Section 8 and PHS housing waiting lists, but admitted she does not want to leave the property because it belonged to her family and she does not have to pay rent. The Title of the house is not in her name, therefore, CUA has encountered problems approving assistance. She opined it would be inappropriate for the Children to return to that home, considering the conditions.

Regarding visitation, Ms. Sanders stated Mother has visited with S.D.S., at Woods twice in 2017, April and 10/23/2017. Mother's visits with T.R.G., are every

Tuesday, supervised at the Agency. She attended 6 out of 14 scheduled visits. Overall, Mother is inconsistent with visitation.

This Court also heard pertinent testimony from Casey Chavinka, Program Specialist at Woods, who was S.D.S.'s Special Services Manager since June of 2016. She noted the Child has been residing at Woods since 7/30/2015, and currently receives 24-hour supervision and intermittent visual supervision overnight, with face-to-face bed checks every 10 minutes. He attends school at Davis Elementary, off campus and receives PT, OT, and Speech Therapy. The Child has improved in walking and is now eating with utensils. Regarding Mother's visitation, Ms. Chavinka testified she contacts her once per month, then if that is not successful, she contacts her a second time. Mother responds about 50% of the time. Mother has never attended the ISP Meetings at the facility, although she is invited. Mother's only level of participation in S.D.S.'s life is giving verbal consents to nursing calls she receives. She noted her records show Mother has visited the Child three times since she took over. Her most recent visit was 10/23/2017, and she saw him on 4/19/2017, three times total in 2017.

This Court heard clear and convincing evidence presented to terminate Mother's parental rights because Mother did not perform parental duties and did not provide for the Children's needs for a permanent, healthy, safe environment. Mother's lack of action demonstrates her inability to care for the Children now or in the future. Mother's overall situation is no better today than when the Children came into care. Mother lacks adequate housing, lacks employment, lacks adequate parenting skills and failed to comply with mental health treatment. The evidence is credible and sufficient that Mother

21

lacks the capacity to adequately provide parental care and control, and a safe, stable environment for both Children.

## B. The Trial Court Properly Found that Termination of Mother's Parental Rights was in the Children's Best Interest and that DHS Met Its Burden Pursuant to 23 Pa.C.S.A. §2511(b).[2]

After the Court finds that the statutory grounds for termination have been satisfied, it must then determine whether the termination of parental rights serves the best interests of the children pursuant to 2511(b) In re Adoption of C.L.G., 956 A2d 999 (Pa.Super 2008). In terminating the rights of a parent, the Court, "shall give primary consideration to the development, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. §2511(b). One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child. In re T.S.M., 71 A3d.

Next, Mother asserts that the Court committed reversible error when it involuntarily terminated Mother's parental rights without giving primary consideration to the effect that the termination would have on the developmental, physical and emotional needs of the Children. This Court adamantly disagrees.

---

[4] Other Considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1),(6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

This Court again relied on the credible testimony of Ms. Sanders and Paternal grandmother, M.G., who provided both tangible and intangible dimensions of the needs and welfare of the Children. The tangible needs involves providing for the physical necessities of life including shelter, food, clothing and medical care. The intangible dimension involves consideration of the love, closeness, comfort and security shared between the Children and their caretaker.

Ms. Sanders opined that the Children would not suffer irreparable harm and it would be in their best interest if both parents' rights were terminated. Regarding T.R.G., the Child states he likes to visit with Mother, however, he feels safe with his Paternal Grandmother. He never asks for his parents and seems happy in his home. He does receive special services because he was having issues last year in school. Paternal Grandmother is the one who attends all the school meetings and counseling sessions. Regarding S.D.S., Ms. Sanders testified the Child has seen his Mother twice in 2017. Mother is always provided with tickets for transportation by CUA, however, Mother does not use the tickets. The Child now receives physical and occupational therapy twice per week. The Child is now walking on his own, and is eating with utensils. He continues to be nonverbal, but is making various noises, and she has seen the Child progressing while at Woods. Sanders noted that S.D.S., is 7 years old and there is no parental bond between Mother and the Child. He has occasional visits with his Paternal Grandmother and Paternal Aunt, and continues to have Court ordered visits with his sibling, T.R.G.

Ms. Sanders further testified that T.R.G., is 10 years old and has been with Paternal Grandmother for approximately two years. She opined she believes there is a

23

bond between T.R.G., and Mother, however it is not a parental bond, which the Child has with the Paternal Grandmother who provides for his care and safety.

### C. The Trial Court Properly Terminated Mother's Parental Rights and Changed the Children's Goals to Adoption

Finally, Mother alleges this Court committed reversible error, when it terminated Mother's parental rights and changed the Children's goal to Adoption. This Court found substantial, sufficient and credible evidence was presented to establish Adoption as the appropriate goal in the best interest of both Children.

Testimony was presented that showed both Children have thrived and shown substantial improvement in their conditions by living in foster care. The testimony of both Ms. Sanders and Paternal Grandmother, M.G., was sufficient to provide the Court with adequate evidence to evaluate the parent-child relationship between Mother and her two Children. The totality of the evidence supports the Court's conclusion that termination of the Mother's parental rights and a goal of Adoption is in the best interest of both Children.

### CONCLUSION:

At the conclusion of the Hearing the Court stated:

> The evidence is clear and convincing that Mother has never really put herself in a position to parent these Children. Once they were removed, she abdicated any parental relationship with them. She declined to complete the services and engage in the services that would put her in a position to parent these Children. She has failed to maintain an ongoing relationship with these Children. Of course, it is a much stronger case with S.D.S., because he has special needs. But the story is the same with respect to both Children; that Mother has again declined to take full advantage of the services that were offered to her.

24

She lives in a substandard and deplorable home, as the testimony goes, and the testimony was uncontradicted, and the home has never been repaired. It is pretty much in the same state that it was when the Children were removed. And part of the removal, was the inadequate home and inadequate care. Mother declines to participate. She declines to parent. They were removed from her care when they were brought into DHS' care, and they remain there. It is now working on 27 months, and the visitation is sporadic, at best. So, Mother's rights are terminated pursuant to 2511(a), (1), (2), (5) and (8), all those sections being met. Although only one is required, the Court finds that there is clear and convincing evidence under all four of the sections.

2511(b) is satisfied because there would be no irreparable harm to severing Mother's rights. While the Children may recognize Mother as a figure in their life, they do not recognize her as a parental figure. That privilege and status goes to the Paternal Grandmother who has, in fact, provided for all the needs since they were brought into care.

It would be in the best interests if the rights of Mother be terminated, and at least it would be in their best interests to be adopted.
(N.T., 10/25/2017, p.91 at 16-25; p.92 at 1-25; p.93 at 1-22).

For the foregoing reasons, this Court respectfully requests that the Decrees and Orders of October 25, 2017, Terminating Mother, V. H.'s Parental Rights to her minor Children, S.D.S. and T.R.G., and changing the Children's Permanency Goal to Adoption be AFFIRMED.

**BY THE COURT:**

_____
ALLAN L. TERESHKO, Sr. J.

12/7/17
**DATE**

25